**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOE W. COLLIER**                                                                    **PLAINTIFF**

**VS.**                                          **CIVIL ACTION NO.: 3:16-CV-66 WHB-JCG**

**UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**                      **DEFENDANT**

---

**MEMORANDUM BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

**COMES NOW**, the University of Mississippi Medical Center [UMMC], and files this, its memorandum brief in support of its motion for summary judgment, and would respectfully show the following:

**INTRODUCTION AND PROCEDURAL HISTORY**

This case concerns the actions and inactions of Plaintiff Joe Collier which led UMMC to terminate his employment.  Plaintiff Joe Collier improperly accessed his NCIC terminal to run a firearm without any law enforcement justification.  Notwithstanding his improper access, the firearm he ran returned a possible "hit" as a stolen weapon.  Instead of taking the weapon into custody as potential evidence and instead of responding to the "hit" to confirm it, Plaintiff did nothing and told the employee to "take it home" and "don't carry it."  Plaintiff Collier's actions and response were not up to the level expected of a police officer and field training officer with the UMMC Police Department.  His actions showed a lack of professional judgment and a dereliction of his duties as a sworn, certified law enforcement officer of the State of Mississippi. Due to his conduct, Plaintiff was terminated.

1

Plaintiff contends that his termination was on the basis of sex discrimination because the employee who brought the firearm to Plaintiff Collier to repair, a female Arteshia Williams, was given a written warning instead of termination. However, these employees were not similarly situated, and the conduct which led to Plaintiff's termination is solely attributable to Plaintiff Collier.

## FACTS

### Joe Collier

Plaintiff Joe Collier was hired as a police officer with the University of Mississippi Medical Center Police Department in 2007. Plaintiff Collier was sworn in as a police officer. He attended law enforcement training at the Mississippi Law Enforcement Officer's Training Academy and graduated on June 21, 2007. *See* Joe Collier's Certificate of Completion from the Mississippi Law Enforcement Officer's Training Academy, attached to Defendant's Motion for Summary Judgment as Exhibit "A". Plaintiff Collier also completed the Mississippi Justice Information Center Mobile Certification on June 27, 2012. *See* Joe Collier's Certificate of Completion from the Mississippi Justice Information Center, attached to Defendant's Motion for Summary Judgment as Exhibit "B". Mobile Certification is required for an officer to be able to access the National Crime Information Center [NCIC] on the computer and check licenses, tags, wanted persons, firearms, etc. *See* Affidavit of Barbara Broadway, attached to Defendant's Motion for Summary Judgment as Exhibit "C". Collier has also attended numerous other training programs and courses and was a field training officer at UMMC. *See* Certificates, attached to Defendant's Motion for Summary Judgment collectively as Exhibit "D", *see also* the deposition testimony of Collier at p. 26, ln 16 to p. 27, ln 3, attached to Defendants' Motion for

2

Summary Judgment as Exhibit "E".

As an officer of the UMMC Police Department, Collier's job duties included enforcing motor vehicle and criminal laws, responding to emergencies, recording facts to prepare reports that document incidents and activities, and protecting people and property.[1]  To be an officer, Collier was required to be trained and pass the Mississippi Law Enforcement Officer's Training Academy.[2]

### Comparator Arteshia Williams

Arteshia Williams was hired at UMMC as a security guard on October 28, 2013.  As a security guard, she was tasked with patrolling assigned areas, examining doors and windows, reporting irregularities, providing directions to patients and visitors, and directing traffic and enforces parking regulations.[3] .  She was not a sworn law enforcement officer, and she did not have to complete the police academy.  The security guard position is not a law enforcement position.  *See* Affidavit of Pat Whitlock, Exhibit "F"; *see also* the deposition testimony of Joe Collier at p.16, ln 14-24, Exhibit "E".

At the time Plaintiff Collier ran the firearm through the NCIC database, Williams was still employed as a security guard.  *See* Exhibit F", Affidavit of Pat Whitlock and the transcript of Arteshia Williams [Exhibit "C" to the Affidavit of Whitlock].

---

[1]*See* Exhibit "F", Officer Job Description attached as Exhibit "B" to the Affidavit of Pat Whitlock.

[2]*Id.*

[3] *See* Exhibit "F", Security Guard Job Description attached as Exhibit "A" to the Affidavit of Pat Whitlock.

***Running the Firearm on NCIC***

Arteshia Williams was given a Lorcin .22 caliber pistol from her mother as a graduation present when she graduated from Jackson State University. *See* Transcript of Williams at p. 3, ln 1-12 attached to the Affidavit of Pat Whitlock, Exhibit "F". William's mother had been given the pistol when Arteshia was a small child. Arteshia Williams had dismantled the pistol and something was broken.[4]

About two to three months after Williams started working as a security guard at UMMC, she told Plaintiff Collier about the weapon being broken.[5] Collier told her to bring the weapon to him to check.[6] He took it home for a day or two to check it.[7] He brought ammunition for it.[8] Collier brought the gun back to Williams and told her he fixed it.[9][10][11] Then Plaintiff Collier showed her how to run a weapon on the NCIC computer.[12] She didn't see him enter his code or password. *See* deposition testimony of Joe Collier at p. 18, ln 6-7, Exhibit "E". The gun came

_____

[4] *Id.* at p. 4, ln 10-16.

[5] *Id.* at p. 4, ln 17-22.

[6] *Id.* at p. 5, ln 18-23.

[7] *Id*. at p. 5, ln 23-25.

[8] *Id.* at p. 5, ln 25-26 and p. 6, ln 4.

[9] *Id.* at p. 6, ln 3-4.

[10] *See* deposition testimony of Joe Collier at p. 17, Exhibit "E".

[11] *See* the job description of Joe Collier attached as Exhibit "B" to the Affidavit of Pat Whitlock, Exhibit "F".

[12] *See* the transcript of the recorded statement of Arteshia Williams at p. 6, ln 9-16 attached as Exhibit "C" to the Affidavit of Pat Whitlock, Exhibit "F".

back as stolen. *See* deposition testimony of Joe Collier at p. 18, ln 9, Exhibit "E".

According to Williams, she asked what she needed to do and Plaintiff Collier told her to not get caught with it.[13]  According to Plaintiff Collier, he told her to take it to her mother and "handle this situation because right now I am out of it."[14]  Either way, Plaintiff Collier did not take possession of the weapon, he did not send a "hit" confirmation to the agency that listed it on NCIC, and he did not report to any of his superiors at UMMC that he had run a firearm that came back stolen.[15]

As a mobile terminal operator, and in accordance with NCIC procedures, he was required to contact the agency originating the stolen firearm record to verify that the weapon was stolen. *See* Affidavit of Barbara Broadway, attached to Defendant's Motion for Summary Judgment as Exhibit "C"; *see also* NCIC procedures which is attached to the Affidavit of Barbara Broadway as Exhibit "C".  In addition to failing to confirm that the weapon was stolen with the originating agency, Plaintiff Collier accessed the NCIC database without cause or as part of his job duties. *See* NCIC Misuse Policy, attached to Defendant's Motion for Summary Judgment as Exhibit "G".

Q.    And you were derelict in your duties as a sworn certified law enforcement officer of the Medical Center to enforce the criminal law?

A.    I don't deny that I made that mistake. I never denied that. I never one time denied

---

[13] *See* the transcript of the recorded statement of Arteshia Williams at p. 7, ln 3-6 attached as Exhibit "C" to the Affidavit of Pat Whitlock, Exhibit "F".

[14] *See* deposition testimony of Joe Collier at p. 18, ln 20-22, Exhibit "E".

[15] *See* deposition testimony of Joe Collier at p. 19, ln 1-25, Exhibit "E".

the fact that, yes, I screwed up on that because I trusted her to do the right thing.

My mistake was trusting her. I don't -- I don't deny that fact. I did.

*See* the deposition testimony of Joe Collier at p. 20, attached to Defendant's Motion for Summary Judgment as Exhibit "E".

***Williams reports the gun to UMMC***

Months after Collier ran the weapon, Williams was promoted to police officer and sent to the police academy.  She was sent to the Mississippi Law Enforcement Officer's Training Academy, and during the academy, she received training on Mississippi statutes.[16]  She learned that possessing stolen weapons was a crime.[17]  She immediately reported the weapon to her instructors at the academy.[18]  Her instructor told her to go and turn the weapon in to her captain or the director of her department.  *Id.*  That Friday when she returned home from the academy, she took the weapon to Captain Stamps.[19]

***UMMC's Investigation***

After the weapon was reported to Captain Stamps, the incident was turned over to the human resources department to investigate.  HR Business Partner Pat Whitlock and Molly Brasfield interviewed both Joe Collier and Artesia Williams, as well as collected information from Captain Stamps.

---

[16]   *See* the transcript of the recorded statement of Arteshia Williams at p. 8, ln 11-22 attached as Exhibit "C" to the Affidavit of Pat Whitlock, Exhibit "F".

[17]*See* Mississippi Code 97-37-35.

[18] *See* the transcript of the recorded statement of Arteshia Williams at p. 9, ln 2-18 attached as Exhibit "C" to the Affidavit of Pat Whitlock, Exhibit "F".

[19] *Id.* at p. 10, ln 18-24.

As a result of the investigation it was determined that Arteshia Williams only infraction was a violation of UMMC's Firearms Policy which states:

**UMMC Firearms Policy**

UMMC explicitly prohibits the possession of any handgun, firearm, or other weapons in any form by any student or employee.  Only law enforcement officers on official duty as defined by section 45-6-3 of the Mississippi Code of 1972 are authorized to possess firearms while on campus.

*See* UMMC's Faculty and Staff Handbook at p. 17, attached to Defendant's Motion for Summary Judgment as Exhibit "H".

It was recommended that due to Ms. Williams' status as a security guard, she would not have had required or expected to have knowledge of the state statutes and federal laws related to stolen firearms.[20]  Due to her violation of the firearms policy, she received a written reprimand.[21]

Joe Collier, on the other hand, was found to have multiple infractions and conduct that brought his moral fitness for duty into question.[22]  First, it was determined that as a law enforcement officer, Plaintiff Collier was expected to understand Campus Police Order 03-01, the institutional firearms policy, the procedure for running a firearm only with cause and the Mississippi and federal laws related to stolen firearms. *Id.* Further, his conduct was unbecoming of a law enforcement officer when he failed to take possession and turn over an allegedly stolen firearm upon receiving the report from the mobile device nor did he send the required "hit" confirmation to the agency that listed the firearm as stolen. *Id.*  Due to his multiple violations, he

---

[20] *See* the Affidavit of Pat Whitlock, Exhibit "F".

[21] *See* the Affidavit of Barbara Smith Watson, Exhibit "I".

[22] *See* the Report and Recommendation which is attached as Exhibit "D" to the Affidavit of Pat Whitlock, Exhibit "F".

was recommended for termination.

Barbara Smith Watson, the Director of Employee Relations at UMMC, reviewed the statements and the facts of the case and she approved the recommendation to terminate Plaintiff Collier.  *See* the Affidavit of Barbara Smith Watson, attached to Defendant's Motion for Summary Judgment as Exhibit "I".

## STANDARD OF REVIEW

"Summary judgment is appropriate if the moving party can show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *United States v. Renda Marine, Inc.*, 667 F.3d 651, 655 (5th Cir.2012) (quoting Fed.R.Civ.P. 56(a)). "A factual dispute is 'genuine' where a reasonable party would return a verdict for the nonmoving party." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 282 (5th Cir.2003) (quoting *Lukan v. North Forest Indep. Sch. Dist.*, 183 F.3d 342, 345 (5th Cir.1999)). When considering a summary judgment motion, a court "must review all facts and evidence in the light most favorable to the non-moving party." *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 433 (5th Cir.2013). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir.2003) (citing *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir.2003); *Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.2002)).

## ARGUMENT

I.     **Plaintiff and his comparator are not similarly situated.**

Plaintiff Joe W. Collier is claiming a violation of Title VII in that he was terminated

because of his sex.  To establish a prima facie case of sex discrimination in employment, an employee must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).  Once an employee has made out a prima facie case, an inference of intentional discrimination is raised and the burden of production shifts to the employer, who must offer an alternative non-discriminatory explanation for the adverse employment action. *Id*.  If the employer can provide a legitimate nondiscriminatory explanation, the inference of discrimination drops out and the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for discrimination.  *Id*.

For the purposes of this argument, UMMC concedes that Plaintiff Joe Collier is a member of a protected class, was qualified for the position at issue, and suffered an adverse employment action in that he was terminated.  The crux of this case centers on the fourth prong of the prima facie case, in the fact that he was not similarly situated to his comparator Arteshia Williams in order to establish an inference of discrimination.

Employees who work with different supervisors, who work for different divisions of a company, or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated.  *Id*.  Likewise, employees who have different work responsibilities or who are subjected to an adverse employment action for dissimilar violations are not similarly situated. This is because the Title

VII and the Fifth Circuit require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances."  The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. Also, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions.

If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis. The Fifth Circuit does not, however, interpret "nearly identical" as synonymous with "identical."  Applied to the broader circumstances of a plaintiff's employment and that of his proffered comparator, a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical.   As the Supreme Court has instructed, the similitude of employee violations may turn on the "comparable seriousness" of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction under its rules and regulations. Otherwise, an employer could avoid liability for discriminatory practices simply by coding one employee's violation differently from another's.

In this case, Plaintiff Collier is admittedly different from her comparator Arteshia Williams in nearly every aspect of the analysis.  They had different job duties, different job

responsibilities, different levels of responsibility, and different types of conduct and infractions. Because of all of these differences, these employees are not similarly situated for comparison under Title VII, as discussed in more detail below.

### *Different Job Duties/Responsibilities*

At the time of the incident, Plaintiff Joe Collier was a certified law enforcement officer employed as a police officer[23] at the UMMC Police Department, and Arteshia Williams was employed as a security guard[24].  *See* the deposition testimony of Joe Collier at p. 11, ln 2-4, Exhibit "E"; *see also* the transcript of the recorded statement of Arteshia Williams at p. 5, ln 2-3 attached as Exhibit "C" to the Affidavit of Pat Whitlock, Exhibit "F".

As a police officer, Joe Collier's job duties included enforcing the laws on campus, making arrests, and collecting evidence.  *See* the deposition testimony of Joe Collier, at pp. 14-15, Exhibit "E".  Arteshia Williams was a security guard.  As a guard, she was not responsible for enforcing the criminal laws or making arrests.

> Q:     Now, that job is different from a security guard.  Security guards are not sworn personnel?
>
> A:     No, they are not.
>
> Q:     And they are not tasked with enforcing the criminal law and making arrests?
>
> A:     That's the difference between them and the police.

*See* deposition testimony of Joe Collier at p. 16, ln 18-24, Exhibit "E".

---

[23] *See* the job description of Joe Collier attached as Exhibit "B" to the Affidavit of Pat Whitlock, Exhibit "F".

[24] *See* the job description of Arteshia Williams attached as Exhibit "A" to the Affidavit of Pat Whitlock, Exhibit "F".

11

Q.      At the time you ran the gun on NCIC, had

         Arteshia Williams gone to the police academy?

A.      No.

Q.      So she was not a certified law enforcement

         officer?

A.      No.

*See* deposition testimony of Joe Collier at p 27, ln 7-12, Exhibit "E".

In *Ramirez v. Gonzales*, 225 F. App'x 203, 207–08 (5th Cir. 2007) the Fifth Circuit found

that employees were not similarly situated that had different positions with different job duties.

> First, Ramirez was not similarly situated to Winstead, a legal secretary, and
> Gerardi, a paralegal specialist, because they both held positions different  *208
> from that of Ramirez with different job duties. Although all three shared some
> minor secretarial duties, Ramirez's own self-prepared weekly work assignment
> reports showed that the majority of her tasks were not the same as or similar to the
> work performed by Winstead and Gerardi. Further, Gerardi was a permanent
> employee throughout Ramirez's employment and Winstead completed her
> probationary period two months after Ramirez began working for the USAO.

*Ramirez*, 225 F.Appx at 207-08.

For Title VII purposes, the "similarly situated employees" prong requires that a plaintiff

must show that he was treated less favorably than others "under nearly identical circumstances."

*Love v. Kan. City S. Ry.*, 574 F.3d 253, 259–60 (5th Cir. 2009); *see also Wyvill v. United Cos.*

*Life Ins. Co.*, 212 F.3d 296, 305 (5th Cir. 2000) (declining to find "similarly situated employees"

who had different job duties); *Perez v. Tex. Dept. of Crim. Justice*, 395 F.3d 206, 213 (5th Cir.

2004) (holding that to satisfy the "similarly situated" requirement, the situations of the plaintiff

and the non-protected class member must be more than similar, they must be "nearly identical.").

*Lee*, 574 F.3d at 259–60 ("Likewise, employees who have different work responsibilities or who

are subjected to adverse employment action for dissimilar violations are not similarly situated."),
with, e.g., *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 382–83 (7th Cir.2000)

Because Plaintiff Collier's comparator had a different job title and different job
responsibilities, his comparator is not similarly situated, and his prima facie case fails as a matter
of law.

### Different types of conduct

Furthermore, if the "difference between the plaintiff's conduct and that of those alleged to
be similarly situated accounts for the difference in treatment received from the employer, the
employees are not similarly situated for the purposes of an employment discrimination analysis."
*Id*. at 260 (emphasis in original) (citation and internal quotation marks omitted). *Cardiel v.
Apache Corp*., 559 F. App'x 284, 288 (5th Cir. 2014).   In short, an employee who proffers a
fellow employee as a comparator must "demonstrate that the employment actions at issue were
taken under nearly identical circumstances" for "nearly identical" conduct. *Id*.

The major difference between Plaintiff and his comparator involves the conduct at issue.
Plaintiff Collier had numerous violations that he alone was responsible for and which brought
into question his judgment as a law enforcement officer, while his comparator only had a
violation of the institutional firearms policy.

### Plaintiff Collier improperly ran the firearm on the NCIC mobile terminal, not his comparator

Plaintiff Collier, not Arteshia Williams,  improperly accessed the NCIC terminal to run a
firearm with no law enforcement need.  Collier testifies that he ran the check and that Williams
did not see him enter his code and password.  *See* the deposition testimony of Joe Collier at p. 18,
Exhibit "E".  Plaintiff Collier was the only one of the two who was certified to use the mobile

13

terminal.  *See* the Certificate of Completion from the Mississippi Justice Information Center,

attached to Defendant's Motion for Summary Judgment as Exhibit "B".

        Q.      Well, what we do know is true is you ran it.

        A.      I ran it.

*See* deposition testimony of Joe Collier, p. 25, ln 14-15, Exhibit "E".

        Plaintiff by his own admission ran the firearm.  He admits that he ran the firearm not for a

law enforcement purpose, but to show Arteshia Williams how the system worked.  *See* the

deposition testimony of Joe Collier at p. 18, ln 4-6, Exhibit "E".  Because Williams was not a

law enforcement officer, not trained or certified on the mobile terminal, she had no culpability in

Collier's infraction.

### *Plaintiff Collier failed to follow the "hit" confirmation policy*

        When Plaintiff Collier received the "hit" that the firearm was possibly listed as stolen, he

was required to contact the agency that listed the firearm on NCIC and verify that it was stolen.

*See* the Affidavit of Barbara Broadway, Exhibit "C"; *see also* the NCIC "hit" policy attached to

Ms. Broadway's Affidavit as Exhibit "C".  As previously admitted by the Plaintiff, he ran the

firearm on NCIC, not his comparator.  He was the officer responsible for making contact with the

originating agency to verify the "hit."  *Id*.  Arteshia Williams was not responsible for and had no

duty to contact the originating agency.  This was only a violation by Collier, not Williams.

### *Plaintiff Collier failed to take possession of the firearm*

        As a sworn, certified law enforcement officer, Plaintiff Collier was trained and expected

to be familiar with criminal laws and statutes.  *See* the job description of Joe Collier attached as

Exhibit "B" to the Affidavit of Pat Whitlock, Exhibit "F".  In addition, he was responsible for

enforcing the law and making reports, and that duty encompasses collecting evidence and making reports of incidents that occur. *Id.*. When the firearm "hit" returned showing the gun was possibly stolen, Collier did nothing to secure the weapon as potential evidence. In fact, according to Williams, he gave the weapon back and told her to take it home and not carry it around in response to her questioning him on what to do.[25]

Plaintiff admits that he did not take the weapon into evidence.

Q.     You saw it listed as stolen?

A.     Yes.

Q.     You didn't take it into evidence?

A.     I don't deny that.

Q.     You didn't report it?

A.     I don't deny that.

Q.     And you sent it back home with her?

A.     I don't deny that.

*See* the deposition testimony of Joe Collier at p. 25, ln 14-23, Exhibit "E".

Plaintiff, not his comparator, was the law enforcement officer who ran the weapon, saw the "hit" showing it to be stolen, and had the responsibility to collect it as potential evidence. Collier admittedly failed in his duties and exhibited a lack of judgment and bad decision making.

Q.     So you admitted to human resources that it was a lack of judgment on your part?

A.     Yes.

_____

[25]Collier claims he told her to take it back to her mother and "handle it." This is still not in accord with his duties and responsibilities as a law enforcement officer.

*See* the deposition testimony of Joe Collier at p. 23, Exhibit "E".

>   Q:      Is that true you told human resources it was a bad decision on your part.
>
>   A:      Yes.

*See* the deposition testimony of Joe Collier at pp. 23-24, Exhibit "E".

>   Q.      And you were derelict in your duties as a sworn certified law enforcement officer
>
>   of the Medical Center to enforce the criminal law?
>
>   A.      I don't deny that I made that mistake. I never denied that. I never one time denied
>
>   the fact that, yes, I screwed up on that because I trusted her to do the right thing.
>
>   My mistake was trusting her. I don't -- I don't deny that fact. I did.

*See* the deposition testimony of Joe Collier at p. 20, Exhibit "E".

Plaintiff was not similarly situated to his comparator. Plaintiff Collier, as the law enforcement officer, the field training officer and the certified mobile terminal operator, had duties and responsibilities that his comparator, a security guard, did not have. Because Collier admittedly failed in his duties, that his comparator did not have, the two are not similarly situated, and his claim fails as a matter of law.

***Plaintiff Collier did not report the stolen weapon to UMMC.***

Another aspect that separates Plaintiff from his comparator is how the incident was brought to the attention of UMMC officials. It is undisputed that Arteshia Williams reported the stolen firearm to Captain Stamps. Months after the gun was run on NCIC, Plaintiff's comparator was promoted to officer and sent to the Mississippi Law Enforcement Training Academy. While she was in training in September of 2014, she received training on criminal laws. At this point, she learned the seriousness of the firearm showing up stolen on the NCIC check. She

immediately reported the matter to her instructors and then to UMMC. Once Williams learned of Plaintiff Collier's failure to follow proper procedure, she took the initiative to come forward and report it.

Q:    My question to you is: She reported it to UMC, is that correct?

A:    Yes

Q:    And you did not report it to UMC; is that correct?

A:    No, I didn't.

*See* the deposition testimony of Joe Collier at p. 21, ln 21-25, p. 22, ln 1, Exhibit "E".

Arteshia Williams reported the firearm to UMMC, not Plaintiff Collier. Plaintiff Collier did not make any effort to resolve the issue of the stolen firearm.

Plaintiff Collier and his comparator had different work rule violations and conduct that establish that they are not similarly situated. Therefore, Plaintiff's claims should be dismissed as a matter of law.

## II.    UMMC's Legitimate Non Discriminatory Reason

While UMMC denies that Plaintiff Collier has established a prima facie case, UMMC still offers its legitimate non-discriminatory reason for terminating Plaintiff. Once an employee has made out a prima facie case, an inference of intentional discrimination is raised and the burden of production shifts to the employer, who must offer an alternative non-discriminatory explanation for the adverse employment action. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). If the employer can provide a legitimate nondiscriminatory explanation, the inference of discrimination drops out, and the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for bias based on sex.

17

In the recommendation for termination, UMMC Human Resources Business Partner, Pat Whitlock, made the recommendation to terminate Plaintiff Collier, and in her recommendation she stated:

- **Per Campus Police training documentation and job description as an Officer, Mr. Collier was expected to understand Campus Police Order 03-01, the institutional firearms policy, the procedure for running a firearm only with cause, and the MS statutes and federal laws related to stolen firearms. Mr. Collier was an officer of the law and his conduct was unbecoming of a law enforcement officer when he failed to turn over an allegedly-stolen firearm immediately upon receiving the report from the mobile device. The information that the firearm that was actually stolen in Kansas City, MO may be a firearm other than Ms. Williams does not absolve Mr. Collier of his behavior at the time that he learned the firearm was stolen. His intent was to evade the law. For these performance failures, we recommend that Officer Collier be terminated.**

*See* the report and recommendation attached as Exhibit "D" to the Affidavit of Pat Whitlock, Exhibit "F".

It is undisputed that Plaintiff Collier violated the NCIC policy for running a firearm and responding to a "hit."[26]  It is also undisputed that Plaintiff Collier failed to take possession of the firearm once it came back as potentially being stolen.[27]  It is also undisputed that Plaintiff Collier did not report the weapon to his superiors at UMMC.[28]  It is also undisputed that Plaintiff Collier's actions displayed a lack of judgment, and he admits he was in error.[29]  Plaintiff's only contention is that he should have received a lessor punishment than termination.

---

[26]*See* Collier deposition at p.19, ln 3-13, Exhibit "E"; *see also* Affidavit of Barbara Broadway, Exhibit "C"; *see also* NCIC Hit Policy, Exhibit "J".

[27]*See* Collier deposition at p. 19, ln 17-22; p. 20, ln 3-13, Exhibit "E"..

[28]*See* Collier deposition at p. 19, ln 14-15; p. 20, ln 10-11, Exhibit "E".

[29]*See* Collier deposition, at p. 20, ln 14-21; p. 23, ln 5-17, Exhibit "E".

**Q.**    **And your contention during that interview was, instead of being under**

**investigation for possible termination, that you should have been written up?**

**A.**    **Yes.**

*See* the deposition testimony of Joe Collier at p. 24, ln 12-15, Exhibit "E".

In a claim for disparate treatment, the burden shifting analysis requires the plaintiff, at the

pretext stage, to persuade the court that he has been the victim of intentional discrimination.

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). To satisfy his

burden using circumstantial evidence, the plaintiff must provide sufficient proof that the

defendant's purported justification for the adverse employment action is "unworthy of credence"

and was simply a pretext for discrimination. *Id.*; *Okoye*, 245 F.3d at 513. Because UMMC has

offered legitimate, non-discriminatory reasons for terminating the plaintiff, Collier must offer

sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason

is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the

defendant's reason, while true, is only one of the reasons for its conduct, and another motivating

factor is the plaintiff's protected characteristic. (mixed-motive[s] alternative).*Keelan v. Majesco

Software, Inc.*, 407 F.3d 332, 341 (5th Cir.2005). Thus, the plaintiff must prove " 'by a

preponderance of the evidence that the legitimate reasons offered by the defendant were not its

true reasons' ... 'by showing that the employer's proffered explanation is unworthy of credence.' "

*Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253, 256).

Plaintiff's admitted violations of UMMC's policies and procedures and his admitted lack

of judgment are legitimate non-discriminatory reasons for his discharge, and UMMC is entitled

to judgment as a matter of law.  Plaintiff Collier does not contest that he violated policy or that

he was subject to discipline.  His only complaint is the level of discipline he received.   Because

Plaintiff admits to the conduct at issue, he cannot show that UMMC's reasons for termination are pretextual, and his claims should be dismissed as a matter of law.

## CONCLUSION

Plaintiff Collier has failed to establish a prima facie case of sex discrimination under Title VII. He is not similarly situated to his comparator Arteshia Williams. His comparator had a different job title, different job responsibilities, and different types of conduct to be similarly situated. Because Plaintiff cannot make out a prima facie case, his claim fails as a matter of law and should be dismissed.

Respectfully submitted, this the 23rd day of June, 2017.

**UNIVERSITY OF MISSISSIPPI**
**MEDICAL CENTER**

**BY:**    */s/ Tommy Whitfield*_____
      **TOMMY WHITFIELD, MSB# 102482**
      **tommy@whitfieldlaw.org**
      **WHITFIELD LAW GROUP, PLLC**
      660 Lakeland East, Suite 200
      Flowood, Mississippi 39232
      (601) 863-8221 – Telephone
      (601) 863-8231 – Facsimile

## CERTIFICATE OF SERVICE

I, Tommy Whitfield, of the Whitfield Law Group, PLLC, the undersigned attorney, do hereby certify that I have this day electronically filed the above and foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Joel Dillard, Esq.
JOEL F. DILLARD, P.A.
775 N. Congress Street
Jackson, MS 39202
joel@joeldillard.com

Patrick Lyle Doman, Esq.
LAW OFFICE OF PATRICK L. DOMAN
285 South Foster Street
Dothan, AL 36301
patrick.lyle.doman@gmail.com

*Counsel for Plaintiff*

THIS, the 23rd day of June, 2017.

/s/ Tommy Whitfield
TOMMY WHITFIELD